MONTIETH ET AL., APPELLEES, *v.* THE TWIN FALLS UNITED METHODIST CHURCH, INC., ET AL., APPELLANTS.

(No. 9506—Decided June 11, 1980.)

*Messrs. Gabalac & Houk, Mr. Stephan Gabalac* and *Ms. Frances W. Houk,* for appellees.

*Messrs. Roderick, Myers & Linton* and *Mr. Michael A. Malyuk,* for appellants.

BELL, P. J. Defendants appeal a trial court judgment granting plaintiffs' prayer to quiet title on approximately 0.42 acres of land, based on the doctrine of adverse possession. We reverse.

## FACTS

In May of 1946, the plaintiffs purchased a 300 by 300 foot parcel of land in Munroe Falls, Ohio, from Vern Gaylord. According to the plaintiffs, at the time of purchase, they believed that the now, disputed strip of land belonged to them. This belief was apparently based on certain representations made by the vendor at the time of purchase. The strip of land in dispute measures 62 by 294 feet and abuts the eastern boundary of the plaintiffs' actual property line, as that perimeter is described in their recorded deed.

In reality, however, the strip of land at issue is part of a large, recorded tract purchased by the defendants in 1968 from Stanley Gaylord. The 1968 purchase by the defendants caused the litigants to become adjacent landowners and eventually led to the present action. For the sake of clarity and brevity, the remaining pertinent facts are supplied as they become applicable to defendants' five assignments of error.

### Law and Discussion
#### I.

The threshold question on review is considered in defendants' first assignment of error which charges:

"The trial court erred by applying the wrong test or standard in determining whether appellees are entitled to take title by adverse possession."

Relying on certain language in *Humphries* v. *Huffman* (1878), 33 Ohio St. 395, and *Oeltjen* v. *Akron Associated Investment Co.* (1958), 106 Ohio App. 128, defendants argue that since plaintiffs do not possess color of title to the disputed property, plaintiffs must meet not only the burden of proving that they have held the subject property openly, continuously, exclusively, adversely, and notoriously for 21 years but that they also have "improved" the subject property. Defendants do not define "improvement" but they do suggest that plain-

tiffs either failed to improve the subject property or they did not sufficiently improve it.

We believe that the emphasis defendants put on the character of color of title is misplaced, and, therefore, reject the first assignment of error.

By definition, an individual acquires color of title to property by the following means:

"*** something in writing which, upon its face, professes to pass title, but which does not do it, either from want of title in the person making it, or the defective mode of conveyance that is used, but such writing must not be so plainly and obviously defective as that no man of ordinary capacity would be misled by it.***" 5 Thompson on Real Property (1979 Ed.), 640, Adverse Possession, Section 2550; Accord, *Powers* v. *Malavazos* (1927), 25 Ohio App. 450; 2 Ohio Jurisprudence 3d, Adverse Possession, Section 45.

While color of title is a term of art, the case law indicates that the term connotes several ideas. It may be commonly used as a general *basis* for a *claim* to property, *i.e.*, a reason or justification for an assertion of ownership by adverse possession. Yet, Ohio recognizes *other* bases for such a claim. A few examples of other methods for claiming title to property by adverse possession are: by claim of right, claim of good faith, and claim of possession by mistake. See Note, Requisites of Adverse Possession in Ohio, 22 Univ. Cinn. L. Rev. 480, 484-485.

Strictly speaking, however, color of title goes to, or is one of several aspects contemplated in the elements of "hostile" and "adverse." See 22 Univ. Cinn. L. Rev., *supra*, at 483-484. Similar to a claim of right, a claim in good faith and a claim of possession under mistake, "color of title" concerns the act of disseisin or the act of taking possession of property in contravention of the true holder of title. See Comment, Real Property—Adverse Possession—The Requirement of a Claim of Right, 33 N.Y. Univ. L. Rev. 624 (Book I).

As the above indicates color of title is not in and of itself a necessary and independent element of adverse possession. *Humphries* v. *Huffman, supra; McNeely* v. *Langan* (1871), 22 Ohio St. 32. Color of title assumes an important role only in certain situations:

"***at common law and under the majority rule in this

country the adverse claimant need not have a deed or other writing giving color of title or furnishing foundation for belief or claim of ownership or legal right to enter or take possession of land. So under the rule in the majority of states *color of title is a necessary factor only when it is necessary to establish constructive possession* or claim title to improvements as an occupying claimant or as an aid to proving good faith when required. Color of title dispenses with necessity of other proof that possession is hostile.\*\*\*'' (Emphasis added and footnotes omitted.) 5 Thompson on Real Property (1979 Ed.), 643, Adverse Possession, Section 2550. See, also, *Humphries* v. *Huffman, supra,* paragraph three of the syllabus; *Shuster* v. *Davis* (1929), 7 Ohio Law Abs. 342; 2 Ohio Jurisprudence 3d, Adverse Possession, Section 44.

We do not have this situation before us. The facts in the present case of adverse possession are based on a claim of good faith or possession under mistake. While it is true that *Humphries* v. *Huffman, supra,* at paragraph five of the syllabus, and *Oeltjen* v. *Akron Associated Investment Co., supra,* at 130, state that where there is no color of title ''\*\*\*adverse possession only extends to that part of the land actually occupied and improved,'' we believe defendants interpret this too literally. In the context it was stated, the Supreme Court was obviously referring to the differences previously articulated between color of title and no color of title, vis-a-vis constructive possession. Constructive possession simply does not attach when color of title is lacking.

The overriding concern in the type of case before us is *possession.* See *Yetzer* v. *Thoman* (1866), 17 Ohio St. 130; *McAllister* v. *Hartzell* (1899), 60 Ohio St. 69; *Smith* v. *McKay* (1876), 30 Ohio St. 409. This possession must be hostile and adverse and be accompanied by visible acts which outwardly demonstrate occupation and ownership so as to give notice for the statutory period. See *Humphries* v. *Huffman, supra,* at 403. In the instant matter, it is the act or acts of dominion over the subject property which underlies the burden of proving adverse possession. *Bauer* v. *Bush* (1962), 118 Ohio App. 151. See, also, Annotation 97 A.L.R. 14, 58-74.

In light of the above, we overrule the first assignment of error and find that the trial court did not err in requiring the plaintiffs to establish that they held the disputed strip openly,

continuously, exclusively, adversely, and notoriously for 21 years.

## II.

The following assignments of error contest the application of the facts to the requirements of adverse possession. We, therefore, address them together.

### Assignments of Error Nos. II, III and IV

"2. The trial [court] erred in finding that the elements of open, continuous, exclusive, adverse, and notorious possession were sufficiently proven by the appellees under the facts of this case.

"3. The trial court erred in finding that the twenty-one year statute of limitations had been satisfied by appellees, the evidence not being sufficient for such a finding.

"4. The trial court erred in not finding that the survey conducted by appellants in 1969 sufficiently interrupted any running of the statute of limitations for adverse possession."

The record indicates that when the plaintiffs bought the 300 by 300 foot lot in 1946, they were under the mistaken impression that the disputed property was part of their lot. This belief was apparently based on a walk taken by the plaintiffs and the vendor around the property at the time of purchase. The walk around the boundary included the disputed strip of land. In 1946, this area of Munroe Falls, Ohio, as well as the property in question, was largely vacant and undeveloped. It consisted of wild brush, grass and some trees.

Plaintiffs began building the foundation to their home a year after their purchase. The foundation was placed in the center of what they perceived to be their property. They did not move into the foundation until 1949.

Since 1946, plaintiffs have been spraying and harvesting an apple tree and a cherry tree which were on the disputed property prior to their 1946 purchase. A few pine tree seedlings were planted in 1947. Additional seedlings were planted throughout this period in sections of the disputed property. These pine seedlings were later sold, or used as Christmas trees, and some were transplanted to other areas of the whole property. Some of them still remain on the disputed strip.

In 1950, a pigpen was built on part of the area in question and pigs were raised. This endeavor lasted only one year. A

garden, boarded by temporary wire, replaced the pigpen area in 1951. Between 1951 and 1974, a garden was maintained, but not every year during that 23-year period. Other occasional uses are also indicated by the record, to wit: plaintiffs used it once for a Girl Scout Camping expedition and a shed was built which "straddles" the true boundary line.

The defendants purchased their lot, which includes the disputed property, on December 13, 1968. Defendants had a survey of their property taken the following month. In the first half of 1970, a trustee of the defendants informed the plaintiffs that the disputed strip belonged to the defendants. The meeting between the above individuals was instigated because the defendants had part of this property graded. The garden was left ungraded because the topography there consisted of the type of slope defendants desired. Plaintiffs also testified that they were informed by a "gentleman that the church hired to do some grading" that they did not own the property. It is unclear whether plaintiffs were referring to the trustee.

In 1972, the minister of the defendant church asked the plaintiffs to sign a document which stated that the plaintiffs claim no interest in the disputed property. It was signed but never delivered. The defendants have also paid taxes on the disputed property since their 1968 purchase and also paid a sewer assessment in 1974. The defendants have mowed part of the land in question for semiannual, church-related flea markets. Finally, in 1974, the defendants graded over the disputed area, which includes the garden.

We have gone to great lengths to reproduce the record because each case of adverse possession rests on its peculiar facts. See *Oeltjen* v. *Akron Associated Investment Co., supra,* at 130. We also note that inherent in the general definition of adverse possession are certain rules of construction. These rules reflect the view that adverse possession is a recognized, but not a favored, procedure for obtaining title of land. Consequently, any claim based on adverse possession is "***construed strictly in favor of the owner of***title***. [In other words,] [t]here are no equities in favor of a person who seeks to acquire the property of another by an adverse holding,***." (Footnotes omitted.) 2 Corpus Juris Secundum, 648-649, Adverse Possession, Section 5.

Of paramount concern in this case is when did the statute

of limitations actually begin to run. According to *Happ* v. *Dayton & Michigan RR. Co.* (1903), 1 N.P. (N.S.) 337, 344, the statute does not begin to run until there is some act of possession by the adverse claimant "***so open, notorious and hostile that it constitutes, in law, notice to the real owner.***"

As to the spraying and harvesting of the two fruit trees which were on the premises before the 1946 purchase, the weight to be accorded these individual acts is summarized in *Oeltjen* v. *Akron Associated Investment Co., supra,* at 130:

"In Ohio, as in the majority of states where the matter has been before the courts, it has been held that one does not have adverse possession of land by a use consisting of cutting hay or gathering natural crop or mowing grass and cutting weeds. *Meyer* v. *Pockros,* 18 Ohio App., 506; 170 A.L.R., 863, and authorities there cited."

The fact that the plaintiffs built their home in the center of what they perceived to be their property, offers no notice that they planned to hold the disputed strip of land hostilely or adversely. Nor do we believe that the planting of a few pine seedlings in 1947 offers the *type* of *notice* required. We doubt whether there could have been any notice recognized in law (open and notorious) in such a rural setting, at least until 1950 when the pigpen was built. This we believe presents the "***most unequivocal evidence of***[plaintiffs'] intention to hold by adverse possession***." *Happ* v. *Dayton & Michigan RR. Co., supra,* at 339. See, also, *Shuster* v. *Davis, supra.* The garden, which replaced the pigpen, also serves sufficient notice of occupancy and continued possession.

The next issue is whether the statute of limitations was tolled. We are of the opinion that the statute was tolled at the time when the survey was conducted for the purpose of grading the property. We add that the plaintiffs were informed in 1970 by an agent of the defendants that the property in question in fact belonged to the defendants. These acts, we believe, are a sufficient demonstration of an intent by the owners of title to recover possession. See *Rosencrantz* v. *Shields, Inc.* (1975), 28 Md. App. 379, 346 A. 2d 237. This entry upon the disputed land by the defendants, evokes a positive interruption of the statutory period and an unequivocal manifestation of intent to reclaim the property. See Annotation 76 A.L.R. 3d 1202, at 1207-1209.

The fact that the plantiffs continued planting the garden in an area of the disputed property becomes irrelevant. First, both litigants *seek title to the whole.* No arguments have been made relating to parts of the disputed strip. Second, the record indicates that the only reason that the garden was not graded over in 1970, was that the topography fell within the defendants' intended design. After the 1969 survey, and the notice by defendants to plaintiffs of rightful ownership and the subsequent grading, the garden's existence continued at the permission of the defendants. With the above interruption, the statute of limitations tolled. See *Satchell* v. *Doram* (1855), 4 Ohio St. 542.

We find that defendants' Assignments of Error Nos. 3 and 4, and part of Assignment of Error No. 2, are well taken.

### III.

Defendants' last assignment of error claims:

### Assignment of Error No. V

"The trial court erred in applying the doctrine of adverse possession to a non-profit, religious organization, i.e., the Twin Falls United Methodist Church."

In light of the above, we overrule this assigned error.

To conclude, we reverse the judgment of the trial court. In so doing, we hold that the statute of limitations did not begin to run until 1950, when plaintiffs' possession became open and notorious. We further hold that the statute of limitations was tolled in 1969 by the unequivocal acts of defendants. Consequently, plaintiffs failed to meet the 21-year period of adverse possession as dictated in R. C. 2305.04.

The judgment is reversed and final judgment entered in favor of defendants.

*Judgment reversed.*

VICTOR, J., concurs.