DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment issued by the Ottawa County Court of Common Pleas, in an action to quiet title involving claims of adverse possession. Because we conclude that the trial court erred in its determinations, we reverse.
 {¶ 2} The subject of this adverse possession case is a strip of property and a small peninsula situated between adjacent properties: a parcel on the east owned by appellant, Young's Suburban Estates ("Young's"), and a parcel on the west owned by appellee, Douglas G. Franck ("Douglas"). The southern boundaries of the essentially rectangular-shaped parcels have irregular shorelines bordering the bank of the northern side of the Portage River in Ottawa County, Ohio. The peninsula which extends into the river is also located between the Young's and Franck parcels.
 {¶ 3} In 1997, Douglas's mother and father, Robert Franck ("Robert"), sought to transfer ownership of the Franck parcel to Douglas. Pursuant to this transfer, a survey was done in 1998 revealing that three mobile homes just north of the peninsula ("northern area") on the Young's parcel encroached on the eastern edge of the Franck parcel. According to the 1998 survey, the maximum width of the encroachment from the mobile homes out to the edge of the peninsula was just under 14 feet. The survey also showed that a small strip on the western side of the peninsula was also within the Franck property line.
 {¶ 4} In December 1999, Douglas filed an action to quiet title to the property, owned by his family since 1970, seeking to remove alleged encroachments represented by the mobile homes and improvements on the peninsula. Young's answered and counter-claimed that it owned the disputed areas by virtue of adverse possession. In a trial to the bench, the following evidence was presented on Young's counterclaim.
 {¶ 5} Young's first offered the testimony of Jerry Russ to show the history of ownership and use of its parcel. Russ testified that, in 1974, he and his wife purchased on land contract from Julian and Mary Bungart a mobile home park, then known as "Riverview Mobile Homes." The park was located on the northern banks of the Portage River in Ottawa County, Ohio. Russ further testified that his parcel included the peninsula and an island just to the west of the peninsula. In the area just north of the peninsula, abutting the western edge of Young's property, there were three mobile home lots, numbered 39, 40, and 41. Russ stated that when he purchased the property in 1974, he recalled that there were mobile homes on concrete pads and electric utilities located on the three lots in the northern area. Russ collected rent from the tenants of those mobile homes and lots which were maintained continuously from 1974 through 1988.
 {¶ 6} Russ also testified that the peninsula was used as a seasonal camping site. He said that from April to October each year, he mowed the grass and rented spaces on the peninsula for tent campers and travel trailers. Although no survey was done, Russ believed that he was purchasing the entire peninsula. In 1975 and 1976, he hauled stone to improve the driveway and turnaround located on the length of the peninsula. In 1975, Russ also hauled stone to cover up appliances such as washers, dryers, and refrigerators which had been placed along the western bank of the peninsula to prevent erosion. He stated that he had also torn down an old garage which stood on the peninsula. In addition, Russ testified that he poured several concrete pads on the peninsula, for use with the seasonal campers and travel trailers. Russ said that Robert Franck had told him that he was doing a nice job making improvements to the property, "especially back by the river." According to Russ, he never had any specific conversations with Robert Franck or his son Douglas about his use of the peninsula.
 {¶ 7} Russ noted that in 1979, he was granted a permit by the Army Corps of Engineers to rebuild an island just to the east of the peninsula. He stated that all improvements to the island, including the hauling of stone for the causeway and driveway, the placement of docks, and the pouring of concrete pads for travel trailers, were begun after the permit was granted. The permit, however, did not concern the peninsula or northern area with the three mobile homes, the areas now in dispute. In 1987, Russ sold the mobile home park, including the peninsula and northern area, to Young's Suburban Estates, Inc. who purchased it as income producing property. Russ paid off his land contract from the proceeds of the sale. The property was first deeded to him and his wife, Patricia, in November 1987, with a new deed then issued to Young's in January 1988.
 {¶ 8} David Young, president of Young's Suburban Estates, Inc. testified that when the park was purchased in 1987 no survey was done. Like Russ, he bought the parcel with the belief that it included the entire peninsula and the three mobile homes to the north. Young's continued to collect rents from the tenants of the mobile homes, to rent the seasonal camping spots on the peninsula, and to maintain the peninsula and northern area. Young's provided copies of 1977 and 1978 rental agreements with tenants, showing that the mobile homes in the area north of the peninsula existed then. At the completion of David Young's testimony and admission of several exhibits, Young's then rested.
 {¶ 9} On rebuttal, Douglas presented the testimony of his father, Robert Franck. Robert testified that he had owned the parcel next to Young's since 1970. He confirmed that in 1997, he and his wife deeded the parcel to appellee, their son, Douglas. Robert stated that when he purchased this property in 1970, no survey was done but that he "knew" where the boundary lines were. Robert noted that approximately ten years before, while mowing the field area, he had surmised that the tenants in the mobile homes might be encroaching on part of his property. Nevertheless, Robert stated that it didn't bother him since the field was "just a reserve." He never said anything to Russ or to Young's about the encroachment.
 {¶ 10} Robert further confirmed that he had observed Russ hauling stone out to the peninsula, and had complimented him on the stoning and improvements being made to the property. Robert stated that he never walked down to inspect the peninsula or lower field area of his property which was marshy and overgrown. He sometimes, however, rode a motor bike out to the peninsula to visit friends who had rented a camping space and kept a travel trailer there.
 {¶ 11} Douglas Franck also testified and acknowledged that he did not know where the property boundaries were. He also said that he had occasionally used the boat ramp at Young's and could see the peninsula from the river while boating.
 {¶ 12} Ultimately, the trial court ruled that Young's had not established adverse possession, basing its decision on certain factual findings. Young's now appeals from that decision, setting forth the following three assignments of error:
 {¶ 13} "First Assignment of Error: Trial Court committed reversible error when it ruled that the plaintiff or his predecessor knew or should have known of the unilateral mistake made by the defendant's predecessor in the placement of trailers and trailer pads.
 {¶ 14} "Second Assignment of Error: The trial court committed reversible error when it failed to grant to the appellant/Young's that portion of the area north of the peninsula that had been adversely possessed by more than 21 years.
 {¶ 15} "Third Assignment of Error: The trial court committed reversible error when it failed to grant to the appellant/Young's that portion of the peninsula that had been adversely possessed by more than 21 years."
 {¶ 16} Since all of Young's assignments of error deal with the issue of adverse possession, we will address them together. Young's essentially challenges the trial court's factual findings and the resulting application of the doctrine of adverse possession to those findings.
 {¶ 17} In reviewing a trial court's factual findings, an appellate court must "be guided by a presumption that the findings of the trier-of-fact were indeed correct," Seasons CoalCo. v. Cleveland (1984), 10 Ohio St.3d 77, 80. Nevertheless, any findings of fact which are not supported by some competent, credible evidence, will be reversed. Id.
 {¶ 18} In this case, testimony and evidence was presented regarding the ownership and use of the two disputed areas: the peninsula and the area north of the peninsula. In addition, information regarding an island area, just east of the peninsula was presented. In reviewing the transcript and documents, we conclude that the trial court mistakenly attributed certain factors relating to island improvements to the peninsula itself. The court also made other inaccurate, unsupported, factual findings which were likely due to the often confusing form of questions regarding certain activities, such as stoning and other improvements, on the peninsula and the island. We will address those inaccuracies after our analysis of the applicable law.
 {¶ 19} Adverse possession is a recognized but not favored means to acquire property. Montieth v. Twin Falls UnitedMethodist Church, Inc. (1980), 68 Ohio App.2d 219, 224. One can claim ownership of property if he can prove, by clear and convincing evidence that his possession of the disputed land was open, continuous, exclusive, adverse, and notorious to that of the record owner for a period of twenty-one years. Grace v.Koch (1998), 81 Ohio St.3d 577, syllabus; Raymond v. Cary
(1989), 63 Ohio App.3d 342, 343. It "is the visible and adverse possession with an intent to possess that constitutes [the occupancy's] adverse character." Humphries v. Huffman (1878),33 Ohio St. 395, 402. In addition, the occupancy "must be such as to give notice to the real owner of the extent of the adverse claim." Id. at 404. The doctrine of adverse possession applies to persons who honestly enter and hold land in the belief that it is their own, as well as to persons who knowingly appropriate the land of another for the purpose of acquiring title. Vanasdal v.Brinker (1985), 27 Ohio App.3d 298, 299, citing Yetzer v.Thoman (1866), 17 Ohio St. 130, 133.
 {¶ 20} The possession must be visible and open to the common observer of the property so that the owner or his agent, on visiting the premises, might readily see that the owner's rights are being invaded. Kaufman v. Giesken Ents. Ltd., 3rd Dist. No. 12-02-04, 2003-Ohio-1027, ¶ 31. Although merely mowing the grass or engaging in minor landscaping alone is insufficient to establish adverse possession, such activity is "relevant evidence of open and notorious use, and when combined with other activities under the proper circumstances it may help to establish an adverse possession." Glaser v. Bayliff (Jan. 29, 1999), Montgomery App. No. 98-CA-34, citing to: Vanasdal, supra,; Coburn v. Gebauer (Jan. 11, 1996), Seneca App. No. 13-95-14. The open and notorious requirements are satisfied if the use is visible or of common knowledge to the general public.Davis v. Konjicija (1993), 86 Ohio App.3d 352, 356. Continued open and notorious use by the grantor will be deemed adverse to the grantee where it is of such a nature as to be totally inconsistent with the rights of the grantee. Rosenstihl v.Cherry (1926), 114 Ohio St. 401, 413.
 {¶ 21} Furthermore, actual notice of adverse possession on the part of the title owner is not required since "the owner is charged with knowledge of adverse use when one enters into open and notorious possession of the land under a claim of right." Id. In Ohio, building a permanent structure on another's land without permission is sufficient to constitute adverse possession of the part of the land encroached upon after 21 years. Rader v. Brock
(Oct. 13, 1997) Preble App. No. CA97-03-007, citing toCincinnati v. Evans (1855), 5 Ohio St. 594, syllabus (where plaintiff erected a large and valuable building that encroached on city street and occupied it in adverse possession for more than twenty-one years, city was barred from use of property). See, also, Wilberforce University v. College of Ed. and Indus.Arts at Wilberforce University (1948), 86 Ohio App. 121, paragraph three of the syllabus. Unless by contract, license or agreement, the erection of a structure asserts a claim of right and dominion over the property which is open, notorious, exclusive, adverse and hostile. See Board of Education v.Nichol (1942), 70 Ohio App. 467; Sowa v. Schaefer (1931),38 Ohio App. 522; Meyer v. Pockros (1924), 18 Ohio App. 506.
 {¶ 22} Moreover, a claimant is not "required to make express declarations of adverse intent during the proscribed period."Kaufman, supra at ¶ 29, citing Powell, Real Property (1995) 91-23, Section 1013[2][c]. "Where one of two proprietors, respectively, of adjoining lands holds actual, continuous, notorious and exclusive possession up to a certain line, though not originally the true one, for the full period of twenty-one years, the statute of limitations applies in his favor and against the adjoining proprietor, although such possession may have grown out of the mutual mistake of the parties respectively, in respect to the locality of what was originally the true line between them." Yetzer, supra, at the syllabus.
 {¶ 23} To establish the necessary 21 year period, a party may add to his own term of adverse use any period of adverse use by prior succeeding owners in privity with one another. Zipf v.Dalgarn (1926), 114 Ohio St. 291, 297-298. The chain of adverse use by prior succeeding owners ending with the person claiming title by adverse possession, known as "tacking," may not be broken, however. Id. Glaser, supra. To determine whether adverse possession should be granted, each case depends on the evidence presented at trial regarding the use and treatment of the land. Kaufman, supra; Swinson, supra.
 {¶ 24} Finally, in property dispute cases, the equitable doctrine of estoppel may also apply if (1) the record owners realized the true boundary of their property; (2) they knew or had reason to know that the other party would rely on their declarations or conduct regarding a boundary line which did not conform to the description in her title; (3) the other party relied on these declarations in ignorance of the title of the line described in the title and occupied to the line declared; and (4) that the other party would be injured if the record owners are permitted to establish the boundary line as stated in their title. McAfferty v. Conover's Lessee (1857),7 Ohio St. 99, 105-106. Estoppel may only be applied where possession meets the 21 year time period for adverse possession to ripen into title. Id., at the syllabus; Bullard v. Tibboles (Nov. 8, 1991), Ottawa App. No. 91-OT-013.
 {¶ 25} In this case, evidence was presented regarding the peninsula and the mobile homes located in the area north of the peninsula. In its factual findings, the trial court referred to only two mobile homes. All the evidence presented, including aerial maps and tenant leases, supports that there are and have been three mobile homes which encroach in a strip with a maximum width of approximately 14 feet since at least 1977. Russ testified that the mobile homes, with concrete pads and utilities, were already in place as early as 1974. Therefore, the trial court's factual findings as to the number of homes and duration of occupation was in error, since the evidence shows mobile homes were in place in the area north of the peninsula, at the very least, 22 years before Douglas's filing of the quiet title action.
 {¶ 26} The undisputed evidence is also that Russ and Young's rented these homes to tenants and acted as if the property was, in fact, theirs. No evidence was presented that any agreement between the parties existed or that Russ or Young's asked Robert or Douglas Franck for permission to use the disputed areas. Robert Franck testified that ten years earlier he thought that the trailers were on part of his property, but never said anything to Russ or Young's. In other words, he was aware of the placement of the structures and the possible encroachment, but did not take any action. Therefore, Robert knew or should have known that the mobile homes encroached on his property line. In our view, the adverse usage of this strip was open and notorious for more than 21 years, meeting the requirements for adverse possession.
 {¶ 27} Turning now to the peninsula area, we will first discuss the trial court's factual findings. The court mistakenly used the dates of April or July 1979 for the first improvements to the peninsula. These dates, however, correlate to when Russ began making improvements to the small island area just to the east of the peninsula, pursuant to his permit from the Army Corps of Engineers. The permit, dates, and improvements regarding the island, however, have no bearing on the peninsula or the northern area. In actuality, Russ's testimony was that he improved the peninsula first, hauling stone onto the peninsula in 1975 or 1976, around the edges and to improve the driveway.[1]
Stone was needed to cover the large appliances which had been placed to prevent erosion at the water's edge of the peninsula. During this same period, Russ mowed the grass and also installed permanent concrete pads at the camp sites. Russ and Young's both made improvements and rented these sites to the public every year as part of their businesses, on the assumption that they owned the entire peninsula.
 {¶ 28} Once again, Robert Franck knew of the improvements being made, and even complimented Russ on his actions. Moreover, Robert never said anything to Russ or Young's about the use of the property and the camp sites which were used by the public. Robert never utilized the property or acted as if he owned it. He never objected at the use or improvement of the peninsula, but instead mowed the empty field behind the mobile homes in conformity with their use. His son, Douglas, admitted that he did not know where the boundaries were, but knew that Russ and Young's were using the peninsula. Consequently, even if Robert or Douglas knew that part of the peninsula was being adversely possessed, their actions were not consistent with the rights of ownership. The Francks should not now be permitted to claim ownership after standing silent while Russ and Young's improved and openly used the peninsula from at least as early as 1976, and continued for 23 years before the 1999 action to quiet title. Therefore, we conclude that Young's have established ownership of the peninsula by adverse possession or estoppel.
 {¶ 29} In reviewing the record in this case, including the testimony as well as all aerial photos and survey maps, we note that, as often happens over time, the parties' actions regarding the property boundary in dispute were likely dictated by the natural land formations. The survey map shows the record property line extends south at a right angle to the roadway. Unfortunately, actual use boundaries relating to land formations, as in this case, often do not strictly conform to such a perfect geometry. While the recorded boundary line extends through portions of the mobile homes and slices off what appears to be the western quarter of the peninsula, the actual use boundary stops to the west of that line, at the mowing line behind the mobile homes. It is thus understandable how these events occurred.
 {¶ 30} In summary, under the evidence presented, Young's have established their claim of adverse possession of both the peninsula and the area of three mobile homes to the north of the peninsula. Due to factual findings which were unsupported by the record, we conclude that the trial court erred in failing to find that Young's had established adverse possession of the peninsula and the northern area. Accordingly, Young's three assignments of error are found well-taken.
 {¶ 31} The judgment of the Ottawa County Court of Common Pleas is reversed and remanded for proceedings consistent with this decision, to effectuate the reformation of the property description to reflect the actual usage of the parties. Court costs of this appeal are assessed to appellee.
Judgment reversed.
Handwork, P.J., Lanzinger, J. Singer, J. Concur.
[1] We are aware that Russ's trial testimony and prior deposition testimony appeared to be in conflict or confusing. After reviewing the entire transcript, however, we attribute this confusion to poorly phrased questions, both at trial and at the deposition. Often questions were asked in reference to the island, but Russ's answers would be attributed to the peninsula. Russ said he had reviewed aerial maps and documents before trial to refresh his memory. At trial, he confirmed that, due to easier accessibility, the improvements to the peninsula were done in 1975 and 1976, before any island reconstruction was done.